# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

| | |
|---|---|
| In re:<br><br>North Pointe Holdings (BVI) Ltd. (in Liquidation), *et al.*,<br><br>Debtors in Foreign Proceedings.[1] | Chapter 15<br><br>Case No. 18-24659-SMG<br><br>Jointly Administered |

## MOTION OF THE JOINT OFFICIAL LIQUIDATORS (IN THEIR CAPACITY AS FOREIGN REPRESENTATIVES) FOR ORDER APPROVING COMPROMISE AND SETTLEMENT WITH DEUTSCHE BANK

The Joint Official Liquidators (in their capacity as Foreign Representatives) (the "***Liquidators***") for the above-captioned Chapter 15 Debtors file this motion (the "***Settlement Motion***") and request that this Court enter an order substantially in the form attached hereto as **Exhibit A** (the "***Proposed Order***"): (i) approving, pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "***Bankruptcy Rules***"), the Liquidators' compromise and settlement with Deutsche Bank AG ("***DBAG***") and together with its affiliates ("***Deutsche Bank***"), pursuant to a settlement agreement (the "***Settlement Agreement***") that settles all claims and potential claims that the Liquidators and Deutsche Bank asserted or could have asserted against each other relating to the Biscayne Capital Scheme, and (ii) granting such other and further relief as the

---

[1] The "***Chapter 15 Debtors***" are (i) Diversified Real Estate Development Ltd. (in Official Liquidation); (ii) GMS Global Market Step Up Note Ltd. (in Official Liquidation); (iii) Preferred Income Collateralized Interest Ltd. (in Official Liquidation); (iv) Sentinel Investment Fund SPC (in Official Liquidation); (v) SG Strategic Income Ltd. (in Official Liquidation); (vi) Sports Aficionados Ltd. (in Official Liquidation); (vii) Vanguardia Group Inc. (in Official Liquidation); (viii) Vanguardia Holdings Ltd. (in Liquidation); (ix) Spyglass Investment Management Ltd. (in Liquidation); (x) North Pointe Holdings (BVI) Ltd. (in Liquidation); (xi) Biscayne Capital Holdings Limited (in Creditor Voluntary Liquidation); and (xii) Biscayne Capital (B.V.I.) Ltd. (in Liquidation). In addition to the Chapter 15 Debtors, Sentinel Mandate & Escrow Ltd. ("***SME***") is a party to and a releasor under the Settlement Agreement described in this Motion. SME is not a Chapter 15 Debtor, and the Liquidators are not seeking relief related to SME in this Motion.

Court deems just and proper.  A true and correct copy of the Settlement Agreement is attached as **Exhibit B**.[2]

**PRELIMINARY STATEMENT**

1.      The Liquidators seek approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 and principles of international comity.  The Settlement Agreement is the culmination of a multi-year investigation into Deutsche Bank's activities related to the Biscayne Capital Scheme (further explained herein), as well as more than two years of litigation, including a trial by jury, and multiple months of settlement negotiations after the parties filed appeals with the United States Court of Appeals for the Eleventh Circuit (the "***Appellate Court***").

2.      The parties executed the Settlement Agreement on January 22, 2024.  By an order entered on December 15, 2023, the Grand Court of the Cayman Islands (the "***Cayman Court***"), the main court supervising the liquidation of the Chapter 15 Debtors, granted sanction (*i.e.*, authorization) to the Liquidators to settle as contemplated in a term sheet describing the Settlement Agreement (the "***Cayman Approval Order***").  A true and correct copy of the Cayman Approval Order is attached hereto as **Exhibit C**.  Additionally, the Minute of Order of the Cayman Court (the "***Minute of Order***") which sets forth the Cayman Court's reasoning and the evidence relied upon for entering the Cayman Approval Order is attached hereto as **Exhibit D**.

3.      The Settlement Agreement requires Deutsche Bank to pay $43.5 million into an interest-bearing escrow account, at a prevailing market rate, within fourteen days of full execution of the Settlement Agreement.  Within seven days of final Court Approvals, the Settlement Sum together with all accrued interest will be released from escrow to the Liquidators

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Settlement Agreement.

2

in exchange for the Mutual Release, Dismissal of Claims, and Dismissal of the Appeals becoming effective.  The Settlement Agreement is a bilateral agreement between the Liquidators and Deutsche Bank, and it seeks no relief related to any third party.

4.      Approval of the Settlement Agreement by this Court is appropriate.  It will, among other things, permit the Liquidators to recover $43.5 million on their claims against Deutsche Bank.  The Liquidators originally brought a total of eight claims against Deutsche Bank.  After motions to dismiss, summary judgment rulings, directed verdict rulings, and other proceedings, a total of four were tried to a jury in April 2023.  The jury returned verdicts in favor of Deutsche Bank on all but one of those claims.  On the sole remaining claim, a claim for negligence, the jury returned a verdict in favor of the Liquidators for $95 million. Cross-appeals have followed and are currently pending before the Appellate Court.

5.      Approval of the Settlement Agreement is appropriate first and foremost because it favorably and immediately resolves this litigation and the ongoing appellate risks.  The Settlement Agreement represents an appropriate, good-faith, arm's length settlement of disputes that more than satisfies the Eleventh Circuit's standards for settlement approval under Bankruptcy Rule 9019.

6.      Approval of the Settlement Agreement is also appropriate under principles of comity.  These cases arise under chapter 15 of the Bankruptcy Code, and they are ancillary to the main liquidation proceedings pending before the Cayman Court.  *See* 11 U.S.C. § 1504.  A primary objective of chapter 15 is to facilitate cooperation between this Court and the Cayman Court and to facilitate the fair and efficient administration of cross-border insolvencies such as this one.  *See* 11 U.S.C. § 1501(a).  Bankruptcy courts sit as ancillary courts under chapter 15, intended to "support, not supplant, a main proceeding in a foreign jurisdiction."  *In re JSC BTA*

*Bank*, 434 B.R. 334, 342 (Bankr. S.D.N.Y. 2010). The Cayman Court, which initially authorized the Liquidators to pursue these claims, has already sanctioned the Liquidators' entry into the Settlement Agreement. Therefore, principles of comity support approval of the Settlement Agreement.

## JURISDICTION AND VENUE

7.     The relief sought in this Motion arises in and relates to the Chapter 15 Debtors' cases pending before this Court (the "***Chapter 15 Cases***"). Accordingly, the Court has jurisdiction to consider this Settlement Motion pursuant to 28 U.S.C. § 1334(b), and this matter is properly referred to this Court pursuant to 28 U.S.C. § 157(a) and Rule 87.2 of the Local Rules of the United States District Court for the Southern District of Florida.

8.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (P), and venue is proper before the Court pursuant to 28 U.S.C. § 1410.

9.     The Court has authority to grant the relief requested pursuant to §§ 105(a) and 1521 of the Bankruptcy Code, 28 U.S.C. § 1651 (the "***All Writs Act***"), and Bankruptcy Rule 9019.

## FACTUAL BACKGROUND

**A.  Summary of the Ponzi Scheme, Formation of South Bay Holdings, Biscayne Capital, the Note Issuers, and the Issuance and Marketing of the Notes.**

10.     The "Biscayne Capital Scheme" that underlies this case and the Settlement Agreement concern a long-running fraud that crosses an extraordinary number of international boundaries. The principals Robert G. Cortes, Ernesto H. Weisson, Juan Carlos Cortes (Roberto's brother), and Frank Chatburn, among others (collectively, the "***Principals***") formed two entities through which they carried out the Biscayne Capital Scheme — South Bay Holdings, LLC ("***SBH***") and Biscayne Capital International, LLC ("***Biscayne***").

4

11.     In its early years, SBH[3] appears to have focused on developing South Florida real estate, frequently financing its activities through traditional real estate lenders.  Starting in 2005, however, Messrs. Weisson and Cortes, together with others, formed a brokerage business.  The brokerage business was generally referred to as "Biscayne."  It targeted, primarily, high-net-worth South American individual investors, and SBH was among the investments Biscayne marketed to its clients-investors.

12.     Over time, the scheme morphed.  The Principals began to raise capital by forming offshore special purpose vehicles that created and offered securities—initially subscriptions for preferred shares in a segregated portfolio company, Sentinel Investment Fund SPC ("***Sentinel***"), and later in the form of tradeable notes (the "***Notes***") issued to investors (the "***Noteholders***").

13.     This use of offshore vehicles to raise capital accelerated over time.  Between 2010 and 2013, four additional offshore, special purpose entities were formed – Diversified Real Estate, Preferred Income, SG Strategic, and GMS Global (the "***Note Issuers***").  Each Note Issuer was legally separate from Biscayne and SBH but in practice were managed day-to-day—and, in some cases, beneficially owned—by the Principals.

14.     The Notes issued by the Note Issuers were sold through the issuance of private placement memoranda (the "***PPMs***").  While the description of the investment changed over time, generally the PPMs disclosed that the proceeds of the Notes would be used to fund investment in high-end South Florida real estate.

15.     Some of the money raised from the issuance of Notes was used in connection with the South Florida real estate that SBH attempted to develop.  However, in most (or all) instances,

---

[3] Since their appointment, the Liquidators have taken control of SBH through assignment.  Currently, 100% of the remaining membership interests are held indirectly by North Point Holdings, Ltd. (in Liquidation), one of the Chapter 15 Debtors.

that real estate was also subject to prior mortgages that were in or near default and those assets could not realistically be liquidated to repay the Notes. Similarly, SBH made substantial capital contributions to Biscayne, subsidizing its losses, including losses that arose from making payments to attract new brokers (and their clients' money) to Biscayne. The new brokers (with their new clients) provided new parties to whom Notes could be sold.

16. Using Note proceeds to fund consistent loss-making ventures like SBH's real estate activity and Biscayne created a problem: there were no assets that could be liquidated to repay the maturing Notes. Thus, the Principals turned to alternative means to continue to prop up the enterprise, included issuing new Notes to repay maturing Notes.

17. In addition to operating a Ponzi scheme to stave off collapse of the enterprise, in many instances, the Principals simply stole money. Sometimes, this theft was orchestrated through "loans" to entities affiliated with Principals that were never repaid. In other instances, the theft was accomplished through personal expenses advanced by the companies that were never repaid.

18. To try to prop up the Biscayne Capital Scheme, the Principals looked overseas and turned to other means to steal money.

19. Specifically, the Principals created several other companies to continue the Biscayne Capital Scheme overseas and obscure it from the oversight of regulators, investors, and others. These included Madison Asset, LLC ("*Madison*"), a Cayman Islands entity incorporated in 2014. Madison was established by the Principals of the Biscayne Capital Scheme and became the entity steering investors toward the Note Issuers to fund the scheme. Madison was operated in substantial part by Gustavo Trujillo ("*Mr. Trujillo*"), its Operations Manager at the time of its formation.

20.    Mr. Trujillo and Deutsche Bank set up custodial accounts in Madison's name including sub-accounts ostensibly to be used to perform custody and clearing services on behalf of the Note Issuers.  In total, Deutsche Bank set up nearly three dozen sub-accounts for various Note Issuers, Chapter 15 Debtors, and other entities related to the Principals and Biscayne.

**B.  Deutsche Bank's Role in the Biscayne Capital Scheme.**

21.    Deutsche Bank was involved in the Biscayne Capital Scheme at multiple levels. Starting in 2009, DBAG agreed to act as issuing agent for Sentinel, when it started to issue securities.  Thereafter, as the Note Issuers began issuing their own notes, DBAG—again— agreed to act as the issuing agent, principal paying agent, and transfer agent.  A DBAG affiliate also agreed to act as registrar.  Each of the Note Issuers entered into similar agreements with DBAG each styled as an "Agency Agreement," and together they are hereafter referred to as the "*Agency Agreements*."

22.    In addition to the Agency Agreements, in December 2011, DBAG entered a Multimarket Custody Agreement with Biscayne Capital Agent de Valores S.A. ("*Biscayne Capital S.A.*"), a Uruguayan company.  Biscayne Capital S.A. is a defunct subsidiary of Biscayne Capital Holdings, Ltd.  It is not in a liquidation proceeding of its own and it is not a chapter 15 debtor.   Pursuant to the Multimarket Custody Agreement, DBAG provided custodial and trading services to Biscayne Capital S.A. and its customers.  In these dual capacities, DBAG both assisted with the issuance of the Notes and facilitated the clearing of Notes into customer accounts.

23.    As the Biscayne Capital Scheme expanded over time, Madison assumed the roles previously played by Biscayne. DBAG facilitated this transition.  On March 7, 2014, DBAG executed a Multi-Market Custody Agreement and agreed to a Direct Securities Services Fee Proposal with Madison. Though that agreement obligated Madison to provide a number of

7

documents to DBAG, DBAG ultimately did not require Madison to provide all of the enumerated documentation as part of the account opening process.  Once the Madison accounts were opened, DBAG allowed Madison to establish the above-referenced sub-accounts for the Note Issuers without requiring sufficient proof of Madison's authority to act on their behalf (and, indeed, did not seek to make the Note Issuers a party to a custodian agreement or require sufficient proof that Madison was authorized to act as a custodian for the Note Issuers).

24.    Once the sub-accounts were opened, DBAG permitted the Principals to misappropriate proceeds from the issuance of Notes on a massive scale that properly belonged to the Note Issuers.  These transfers consisted of thousands of wires made into, out of, and through the Madison sub-accounts that were fully visible to and approved by DBAG, ultimately leaving the Note Issuers with no assets to repay the Noteholders.

25.    DBAG did not terminate its relationship with Biscayne, Madison, the Note Issuers, and related entities until June 2017.

**C.  The Biscayne Capital Scheme Collapses and the Liquidations Commence.**

26.    By early 2018, the Principals were unable to continue raising new funds to pay maturing debts and fund the losses being incurred by the Biscayne Capital Scheme.  The Biscayne Capital Scheme collapsed.  Each of the Chapter 15 Debtors was placed into liquidation proceedings in the jurisdiction of its organization (collectively, these are the "***Liquidations***"), and shortly thereafter these Chapter 15 Cases were commenced.

27.    From the commencement of the Liquidations, it was clear that any recovery for Noteholders would be speculative.  At the first meeting of creditors of the Note Issuers (held in Miami in December 2018), the Liquidators announced that none of the Note Issuers held any substantial assets with which to repay Noteholders and that the recovery for all Noteholders

would be dependent upon identifying the wrongdoers who were responsible and holding them to account.

**D.  The Note Issuers are Placed into Liquidation, the Liquidators Commence Their Investigation and Bring a Lawsuit against Deutsche Bank.**

28.     Each of the Note Issuers is organized under the laws of the Cayman Islands.  In early 2018, the Liquidators were appointed and the Liquidation of each of the Note Issuers (among others) was brought under the supervision of the Cayman Court.  Further details regarding the commencement of the Liquidations are set forth in the *Declaration of Michael Pearson in Support of Petition for Order Recognizing Foreign Main Proceeding and Granting Additional Relief.  See* Docket No. 4.  This Court entered an order recognizing each of the Liquidations as "foreign main proceedings" on January 14, 2019 (the "***Recognition Order***").  *See* Docket No. 22.  By operation of the Recognition Order, section 362 of the Bankruptcy Code became applicable with respect to each of the Chapter 15 Debtors and their property within the territorial jurisdiction of the United States. S*ee* 11 U.S.C. § 1520(a)(1).

29.     Since the Court entered the Recognition Order, the Liquidators have conducted a substantial investigation into the circumstances surrounding the commencement of the Liquidations, specifically the facts surrounding the Biscayne Capital Scheme and the potentially culpable parties.  To date, the Liquidators have served approximately 100 subpoenas, collected approximately 8,000,000 documents, and held hundreds of hours of voluntary interviews with cooperating parties.  The Liquidators also have commenced four civil actions in the United States against a total of 100 different defendants and have otherwise entered into tolling agreements and settlement discussions with several other parties.  Because there are no physical assets of the Note Issuers, any recovery for Noteholders and other creditors will come only from litigation judgments and settlements.

30.     In the Liquidations, an ad hoc committee of creditors (the "***Ad Hoc Committee***")

has been formed to consult and communicate with the Liquidators.  The Liquidators

communicate all major developments with the Ad Hoc Committee and seek its input and

consultation on major decisions impacting the Liquidations, including the proposed Settlement

Agreement.  The Ad Hoc Committee supports the Settlement Agreement.

31.     On July 6, 2021, the Liquidators brought a civil action in the United States

District Court for the Southern District of Florida (the "***District Court***") captioned *Michael*

*Pearson et al.* v. *Deutsche Bank AG et al.* (Case No. 21-cv-22437-BB) (the "***Action***"), alleging

(as stated in an Amended Complaint filed September 24, 2021) fraudulent trading in violation of

Cayman Islands Companies Law § 147 (Count One), aiding and abetting breach of fiduciary

duty (Count Two), breach of fiduciary duty (Count Three), aiding and abetting conversion

(Count Four), breach of contract (Count Five), negligence (Count Six), violation of the Florida

Civil Remedies for Criminal Practices Act (Count Seven), and violation of Florida's Civil

Remedies for Theft or Exploitation Statute (Count Eight), in connection with dealings with

Deutsche Bank AG, Deutsche Bank (Suisse) S.A., Deutsche Bank Luxembourg S.A., and

Deutsche Bank Trust Company Americas.

32.     All counts against Deutsche Bank (Suisse) S.A., Deutsche Bank Luxembourg

S.A., and Deutsche Bank Trust Company Americas were dismissed before trial; seven of the

eight counts against Deutsche Bank AG – Counts One through Five, Seven, and Eight – were

dismissed before trial or resolved at trial in favor of DBAG over several stages of motions

practice; and Count Six (alleging negligence) was resolved in favor of the Liquidators against

DBAG by a jury verdict on April 25, 2023 awarding $95,000,000 to the Liquidators.

10

33.     On October 6, 2023, the District Court entered an Amended Final Judgment (the "***Amended Final Judgment***"), in favor of the Liquidators on Count Six (alleging negligence), and in favor of DBAG on all other counts, and awarding the Liquidators $95,000,000 in damages, $16,587.59 in pre-judgment interest, and $18,072.35 in taxable costs.

34.     DBAG filed a timely notice of appeal, and the Liquidators filed a timely notice of cross-appeal (together, the "***Appeals***") with the Appellate Court, and the Appeals, Case No. 23-13327 and 23-13475, remain pending.

35.     After filing the Appeals, Deutsche Bank and the Liquidators have engaged in settlement discussions with a view to resolving the Appeals and all claims and potential claims that the Liquidators and Deutsche Bank asserted or could have asserted against one another in the Action and/or arising from or concerning the Action or relating to the Biscayne Capital Scheme.  These settlement discussions have been ongoing for several months and have culminated in the parties agreeing to enter into the Settlement Agreement before the Court in this Settlement Motion.

36.     In the Cayman Approval Order, the Cayman Court sanctioned (*i.e.*, approved) the Liquidators' entry into a settlement on the commercial terms set forth in the Settlement Agreement by an order entered on December 15, 2023.  A true and correct copy of the Cayman Approval Order is attached hereto as **Exhibit C**.

**E.  Summary of the Settlement Agreement.[4]**

37.     The Settlement Agreement settles all claims and potential claims among the Liquidators and Deutsche Bank that were asserted or could have been asserted in the Action or

---

[4] Any description of the terms of the Settlement Agreement is for summary purposes only. A true and correct copy of the Settlement Agreement is attached to this Settlement Motion as **Exhibit B**.  If there is any inconsistency between the terms of the Settlement Agreement and the summary provided herein, the terms of the Settlement Agreement control.

relating to the Biscayne Capital Scheme.  The material terms of the Settlement Agreement are as follows:

    a.  Deutsche Bank will pay $43.5 million (the "***Settlement Sum***") into escrow.

    b.  The Liquidators are required to obtain appropriate Court Approvals.  As referenced above, the Cayman Court has already authorized the Liquidators' entry into the Settlement Agreement.  The remaining Court Approval is approval by this Court, which the Liquidators seek through this Settlement Motion.

    c.  Upon receipt of final Court Approvals and exhaustion of any appeals therefrom, the Settlement Sum, together with all accrued interest, will be released to the Liquidators.  At that time the Parties will exchange mutual general releases and seek the dismissal of the Appeals.

**P<small>REDICATES FOR THE</small> R<small>ELIEF</small> R<small>EQUESTED</small>**

38.  This Court has authority under 11 U.S.C. §§ 105 and 1521, 28 U.S.C. § 1651 (*i.e.*, the All Writs Act), and Bankruptcy Rule 9019(a) to grant this Settlement Motion and approve the Settlement Agreement substantially in the form of the Proposed Order attached hereto as **Exhibit A**.

**A<small>NALYSIS AND</small> C<small>ITATION TO</small> A<small>UTHORITY</small>**

**A.  The Settlement Agreement Should Be Approved Under Bankruptcy Rule 9019.**

39.  Bankruptcy Rule 9019(a), entitled "Compromise and Settlement," provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Bankruptcy Rule 9019 further provides that "[n]otice shall be given to creditors,

the United States trustee, the debtor, and indenture trustees as provided in [Bankruptcy] Rule

2002 and to any other entity as the court may direct."

40.    The decision to approve a settlement or compromise lies within the discretion of

the Court and is warranted when the settlement is found to be adequate, reasonable, and fair

considering the circumstances of the case.  *See Chira v. Seal* (*In re Chira*), 567 F.3d 1307, 1312-

13 (11th Cir. 2009); *In re Air Safety Intern., L.C.*, 336 B.R. 843, 852 (S.D. Fla. 2005); *In re*

*Morgan*, 2011 WL 13185742, at *4 (S.D. Fla. Feb. 14, 2011) ("It has long been the law that

approval of a settlement in a bankruptcy proceeding is within the sound discretion of the Court,

and will not be disturbed or modified on appeal unless approval or disapproval is an abuse of

discretion.") (quoting *In re Arrow Air, Inc.*, 85 B.R. 886, 890-91 (Bankr. S.D. Fla. 1988)).

41.    "[A] trial or 'mini-trial' on the merits is not required for court approval of a

settlement."  *In re First NLC Fin. Servs., LLC*, 2009 Bankr. LEXIS 1083, at *13-14 (Bankr. S.D.

Fla. Mar. 12, 2009).   Instead, "the court's responsibility is to canvass the issues and see whether

the settlement 'falls below the lowest point in the range of reasonableness.'"  *Id.* (citing *Official*

*Comm. of Unsecured Creditors of Int'l Dist. Ctrs., Inc. v. James Talcott, Inc. (In re. Int'l Dist.*

*Ctrs., Inc.)*, 103 B.R. 420, 423 (S.D.N.Y. 1989) (quoting *In re W.T. Grant*, 699 F.2d 599, 608

(2d Cir. 1983)) ("We conclude by reemphasizing that the task of the bankruptcy judge was not to

determine whether the settlement was the best that could have been obtained, something that

neither he nor we can ever know, but whether it 'fall[s] below the lowest point in the range of

reasonableness.'").  *Accord Wallis v. Justice Oaks, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d

1544, 1549 (11th Cir. 1990) (determining that a bankruptcy judge does not have "to *decide* the

merits of those claims" being resolved by a settlement, "only the *probability* of succeeding on

those claims.") (emphasis in original).

42.    In determining whether to approve a settlement, courts in the Eleventh Circuit consider the following:

(a)    the probability of success in litigation;

(b)    the difficulty in collecting any judgment which may be obtained;

(c)    the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attendant to it; and

(d)    the paramount interest of creditors and a proper deference to their reasonable views of the settlement.

*In re Justice Oaks II, Ltd.*, 898 F.2d at 1549.  Courts consider these factors to determine "the fairness, reasonableness[,] and adequacy of a proposed settlement agreement."  *Gaddy's S.E. Prop. Holdings, LLC v. Gaddy Electric Plumbing, LLC* (*In re Gaddy*), 851 F. App'x 996, 1000 (11th Cir. 2021).

43.    In ruling on proposed settlements, a court should give weight to the opinion of the parties and their professional advisors that the factors outlined above have been explored and that the compromise is fair and reasonable.  *See Int'l Distrib. Ctrs., Inc.*, 103 B.R. at 420, 423 (recognizing that "[a] court may give weight to the Trustee's informed judgment that a compromise is fair and equitable and consider the competency and experience of counsel who support the compromise").  Indeed, "[r]ecognizing the inherent uncertainty of complex litigation, a settlement's proponents must only establish that, 'all things considered, it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end.'"  *Francisco v. Numismatic Guar. Corp.*, 2008 WL 649124, at *8 (S.D. Fla. 2008) (quoting *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 564, 573 (5th Cir. 1960)); *see also United States v. Hartog,* 597 B.R. 673, 682 (S.D. Fla. 2019) ("In approving the settlement agreement, the Bankruptcy Court … must only have made a pragmatic decision on the basis of all equitable factors [and]

14

[i]mportantly, [t]he decision of a [t]rustee in Bankruptcy to enter a settlement is made within his or her business judgment.") (internal quotations omitted).

44.    The Settlement Agreement is fair and reasonable, and the Court should approve it based on applicable Eleventh Circuit precedent.  The first factor is the probability of success in litigation.  The Liquidators brought a total of eight claims against Deutsche Bank.  All but one of these claims was resolved in favor of Deutsche Bank.  The Liquidators were able to secure the $95 million Amended Judgment on the remaining claim, a claim for negligence, but that Amended Judgment is currently being appealed.

45.    In the appeal of the Amended Judgment, the Liquidators anticipate that Deutsche Bank will raise a series of alleged errors, which, if sustained in whole or in part could have the effect of reversing the Amended Judgment and either requiring a retrial or, potentially, resulting in a complete loss without a retrial.  While the Liquidators are fully prepared to defend the Amended Judgment on appeal, they are mindful of the potential risks.  Deutsche Bank has presented seven different issues for appellate review, including:

    i.    Deutsche Bank owed no duty of care to the Note Issuers because (a) banks owe no duty of ordinary care to monitor transactions in their customers' accounts for fraud,[5] (b) any such duty is barred by the independent tort

---

[5] In advancing this position, Deutsche Bank has relied on certain of the following cases: *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012) ("Although Plaintiffs alleged the transactions were atypical and therefore Bank of America should have known of the Ponzi scheme, such allegations are insufficient under Florida law to trigger liability. Florida law does not require banking institutions to investigate transactions."); *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1322 (M.D. Fla. 2015) ("Florida law imposes no duty on a bank to investigate transactions"), *aff'd*, 677 F. App'x 573 (11th Cir. 2017); *Insight Sec., Inc. v. Deutsche Bank Tr. Co. Am.*, 2022 WL 2313980 (11th Cir. June 28, 2022) ("Haberer was an authorized agent of all the account holders involved in the transfers. Under Florida law, Deutsche generally has no duty to further investigate those transactions."); *Lamm v. State St. Bank & Tr. Co.*, 749 F.3d 938, 947 (11th Cir. 2014) (A bank without discretion to invest a customer's assets had "no independent duty to supervise transactions on a customer's account").

doctrine,[6] (c) the Agency Agreements disclaim any duty of care that

DBAG owed to the Note Issuers,[7] and (d) the Note Issuers were not direct

custodial customers of Deutsche Bank;

ii.  The Liquidators lack standing to pursue the claims against Deutsche

Bank;[8]

iii. The Agency Agreements bar the Liquidators from recovering

consequential damages, which Deutsche Bank alleges were the only

damages that the Liquidators sought;[9]

iv.  The District Court erred in refusing to instruct the jury on apportionment

of damages;[10]

---

[6] In its papers, Deutsche Bank has cited to the following cases to support this position: "[F]undamental contractual principles continue to bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations." *Cafaro v. Zois*, 2015 WL 3821752, at *16 (S.D. Fla. June 2, 2015). The Bank relies on decisions applying Florida's Independent Tort Doctrine to bar negligence claims against banks arising from their performance of contractual undertakings with their customers: *Kalpakchian v. Bank of Am. Corp.*, 832 F. App'x 579, 585–86 (11th Cir. 2020); *Pastor v. Bank of Am., N.A.*, 2023 WL 2646817, at *2 (S.D. Fla. Mar. 27, 2023); *Dorvil v. Nationstar Mortg. LLC*, 2019 WL 1992932, at *16–17 (S.D. Fla. Mar. 26, 2019).

[7] Deutsche Bank has cited to the following provision of the Agency Agreements to support this position: "No obligations or duties of [Deutsche Bank] which are not expressly stated herein or in the Conditions shall be implied." It relies on this language and the following case citations: Restatement (Second) of Contracts § 8 Intro. Note (1981) ("One party can ordinarily, for example, contract out of his duty to exercise reasonable care with respect to the other party and thereby exonerate himself of liability to him for negligence"); *Megaval Enters, Ltd. v. Bank of Am., N.A.*, 2014 WL 12609318, at *4 (S.D. Fla. Oct. 8, 2014) ("[T]he relationship between a bank and a customer is 'created and defined' by the contractual arrangements entered into when an account is opened.") (quoting *Fed. Ins. Co. v. NCNB Nat'l Bank of N.C.*, 958 F.2d 1544, 1547–48 (11th Cir. 1992) and collecting other authorities).

[8] Deutsche Bank relies on *Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1149–50 (11th Cir. 2006), which held that a trustee had no standing to recover for losses to corporations used in connection with a Ponzi scheme.

[9] The Agency Agreements provide: "Under no circumstances will the Agents be liable to the Issuer, any other party to this Agreement, the Note holders or any third party, in contract, tort (including negligence) or otherwise for any consequential, special, indirect or speculative loss or damage (including but not limited to loss of business, goodwill, opportunity or profit) which arises out of or in connection with this Agreement even if advised of the possibility of such loss or damage."

[10] Deutsche Bank relies on intermediate Florida appellate decisions allowing apportionment to an allegedly negligent non-party even though the case arose from an underlying intentional tort. *Hennis v. City Tropics Bistro, Inc.*, 1 So. 3d 1152, 1155 (Fla. 5th DCA 2009); *Burns Int'l Sec. Servs. of Fla. v. Philadelphia Indem. Ins. Co.*, 899 So. 2d 361, 365–66 (Fla. 4th DCA 2005).

16

v.  The District Court erred in instructing the jury on deepening insolvency damages;[11]

vi.  No reasonable jury could have found that Deutsche Bank's negligence was the proximate cause of the Note Issuers' injuries; and

vii.  No reasonable jury could have found that the doctrine of *in pari delicto* did not bar the Liquidators' claims.

46.    Each of these seven grounds on appeal has an *independent* prospect of reversing the Amended Judgment.  The Liquidators submit that the proposed Settlement Agreement is warranted under the circumstances.

47.    Under a best-case scenario on appeal, the Liquidators will prevail in full.  However, given the likely timeline, it may be late into 2024 and more likely into 2025 before the appeal is fully resolved and the Amended Judgment paid.  By that point, the Liquidations will have been pending for more than half a decade.  The Liquidators have taken the timing into account in assessing the settlement, even the timing in a "best-case" scenario on appeal.

48.    If, instead of complete victory on all issues on appeal, Deutsche Bank prevails in the appeal, the potential consequences to the Liquidations are, at minimum, significant and detrimental.  A "best case" loss on appeal is that the matter needs to be retried to a jury, followed – almost certainly – by further appeals.  Even if the Liquidators ultimately prevail at a further trial and a subsequent appeal, any ultimate recovery that could be distributable to creditors may be five

---

[11] Deutsche Bank relies on decisions disallowing this measure in negligence cases, such as: *In re CitX Corp., Inc.*, 448 F.3d 672, 677 (3d Cir. 2006) ("a claim of negligence cannot sustain a deepening-insolvency cause of action"); *In re Oakwood Homes Corp.*, 340 B.R. 510, 534 (Bankr. D. Del. 2006) ("[T]his Court will follow the line of authority that requires a showing of fraud for a successful claim of deepening insolvency" and therefore the plaintiff "is required to show fraudulent conduct—not mere negligence"); *Martinez v. Spear Safer CPAs & Advisors*, 2007 WL 9700782, at *4–5 (S.D. Fla. June 26, 2007) ("Defendant correctly argues that no 'deepening insolvency' damages are available since such damages are only available in fraud cases").

or more years away.  By that time, the Liquidations will have been running for a decade.  In a "worst case" loss in the appeal, including a loss on any one of issues 1-3 or 6-7 above, the Appellate Court would vacate the judgment and foreclose any retrial.  If that were to occur, the Liquidators would recover nothing from Deutsche Bank, one of the primary parties on whom they have focused in the Liquidations.  This would have a devastating consequence for the Liquidations.

49.    For these reasons, while the Settlement Sum represents a significant discount to the Amended Judgment, the Liquidators, in the good faith exercise of their business judgment have determined that it is an appropriate settlement that is in the Note Issuers' best interests.  And, indeed, the Cayman Court has already sanctioned the Liquidators' entry into the Settlement Agreement.  For these reasons, the Liquidators submit that the first of the *Justice Oaks* factors weighs strongly in favor of approving the Settlement Agreement.

50.    The second factor is the difficulty of recovery on the Amended Judgment.  The Liquidators have addressed the appellate risks to the Amended Judgment above and believe that those risks can also be considered in the context of the second factor.  The Liquidators do not believe that there is a material risk of non-recovery of any judgement (including the current Amended Judgment) that survives appeal.  Thus, the Liquidators do not believe that this factor weighs heavily in either direction.

51.    The third factor – the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attendant to it – supports approval of the Settlement Agreement.  *In re Gaddy*, 851 F. App'x at 1002 (recognizing that "[t]he bankruptcy court [is] not required to predict the future; it [is] required to identify potential difficulties in collection" and finding those concerns "coupled with the possibility of costly and protracted litigation [] support[ed] the bankruptcy court's decision to approve the settlement") (citing *In re Chira,* 567

F. 3d at 1312-1313 (affirming bankruptcy court's approval of settlement when the trustee decided to settle "[r]ather than litigate their dispute over [an] arcane and uncertain legal issue . . . [while] fac[ing] the possibility of costly and protracted litigation").  The claims that the Settlement Agreement resolves are exceedingly complex and have required (and will continue to require through the appeal) substantial time to resolve.  As described above, Deutsche Bank played an important part in the Biscayne Capital Scheme but was not the only player.  The litigation against Deutsche Bank took two years to bring to trial.  Deutsche Bank succeeded on certain claims on motions to dismiss, other claims at summary judgment and directed verdict, and ultimately prevailed on all remaining claims at trial other than the claim for negligence.  As presented above, the Liquidators anticipate that Deutsche Bank will continue to pursue every available defense until ultimate disposition.  The complexity of the matter has led, and will continue to lead, to substantial expense, inconvenience, and delay in finally liquidating the Amended Judgment.  Therefore, this factor supports approval of the settlement.  *See In re Se. Banking Corp*., 314 B.R. 250, 273 (Bankr. S.D. Fla. 2004) (approving settlement upon finding that "[t]he evidence shows that the [litigation] presented myriad factual and legal issues . . . on a number of different claims and defenses [that] would be expensive to litigate . . . [for] several years.").

52.    The fourth factor – the paramount interest of the creditors and a proper deference to their reasonable views – also supports approval of the Settlement Agreement.  Importantly, the Liquidators had extensive interactions with the Ad Hoc Committee throughout the settlement process.  The Ad Hoc Committee acts as a voice for the interests of creditors in the Liquidations and supports the Settlement Agreement.  Similarly, the Cayman Court has sanctioned the Liquidators' entry into the terms of the Settlement Agreement.  As the court where the Note

19

Issuers have their center of main interests and the court that oversees the Liquidations at the broadest level, the Liquidators believe that it is appropriate to give deference to the Cayman Court's judgment in assessing the "paramount interests of creditors," just as it is important to give deference under principals of comity, addressed further below. For this reason, the Liquidators submit that the fourth *Justice Oaks* factors supports entry into the settlement.

53.    There are other substantial reasons to conclude that the Settlement Agreement is consistent with the paramount interest of creditors. The consideration provided under the Settlement Agreement is substantial. Indeed, based upon where these Liquidations stood at the commencement of these Chapter 15 Cases – with no money, few hard assets, and extraordinarily complex claims to investigate – the Settlement Agreement represents a singular achievement. *Francisco*, 2008 WL 649124, at *10 (finding "with many possible outcomes, extensive delay, and considering the time value of money" and "[b]alancing the uncertainties of continued litigation . . . including the possibility of zero recovery – the settlement is clearly fair, reasonable, and adequate"). Furthermore, it is appropriate for the Court to give deference to the Liquidators' business judgment. *See United States v. Hartog,* 597 B.R. at 682. In the Liquidators' view, entry into the Settlement Agreement maximizes the likely net recovery from claims against Deutsche Bank, taking into account all relevant factors, including the risk that the Amended Judgment is vacated on a rationale that either forecloses any recovery or requires years of additional litigation in the trial and appellate courts, and the costs of liquidating the claims.

54.    For these reasons, entry into the Settlement Agreement is a sound exercise of business judgment and should be approved. *See In re Morgan*, 2011 WL 13185742, at *4-5 (affirming approval of settlement agreement recognizing that "[c]ompromises are generally approved [if] they meet the business judgment of the trustee" and crediting the "Trustee and

Trustee's counsel[s'] expla[nation] that they had engaged in extensive negotiations to reach the settlement agreement and that they believed that it was reasonable and in the best interest of the creditors." (citation omitted)), *aff'd* 439 F. App'x 795, 795 (11th Cir. 2011) (*per curiam*) (affirming bankruptcy court's approval of settlement agreement and finding "[t]he bankruptcy court approved the settlement because it was the Trustee's best business judgment that the settlement be approved [and] [w]e find no basis in the record for questioning the Trustee's judgment").

**B.** **Principles of International Comity Support the Prompt Approval of the Settlement.**

55.     The Liquidators' primary grounds for seeking approval of the Settlement Agreement arise under the *Justice Oaks* standards, analyzed extensively above.  Were this a case under chapter 11, the Liquidators submit that approval of the Settlement Agreement would be straightforward under those standards.  But principles of international comity make the case for approval even clearer. This is an international matter where the primary court overseeing the Liquidators is the Cayman Court. This Court acts in an ancillary capacity, making principles of comity appropriate and important to consider in assessing the Settlement Agreement.

56.     Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  Adjudicative comity – which the Liquidators request that this Court grant to the prior order of the Cayman Court – "may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state, the so-called comity among courts."  *See Maxwell Communication Corp. ex rel. Homan v. Societe Generale (In re Maxwell Communication Corp.)*, 93 F.3d 1036, 1047 (2d Cir. 1996).

21

57.     Principles of comity suffuse both the chapter 15 statute and chapter 15 practice generally.  Section 1501 sets forth a primary purpose of chapter 15, which is to "provide effective mechanisms for dealing with cases of cross-border insolvency" through cooperation by United States courts with both foreign courts.  11 U.S.C. § 1501(a)(1).  Section 1507 permits a court to grant additional assistance to a foreign representative "consistent with the principles of comity."  *Id*. § 1507(b).  Section 1509(b)(3) helps to effectuate this by mandating that a court in the United States "shall grant comity" to a duly appointed foreign representative.  *Id*. § 1509.  Section 1526 further emphasizes the cooperative role that a United States court is to take with a foreign court and a foreign representative by requiring that the court cooperate "to the maximum extent possible."  *Id*. § 1509.

58.     Case law emphasizes the cooperative role of United States courts in chapter 15 proceedings.  A court under chapter 15 is intended to "support, not supplant, a main proceeding in a foreign jurisdiction."  *See In re JSC BTA Bank*, 434 B.R. 334, 342 (Bankr. S.D.N.Y. 2010).  The goal of chapter 15 is ***not*** "to improperly centralize global control of dispute resolution within an ancillary case in the United States."  *Id*.  While granting comity to orders of a foreign court – here, the Cayman Court's order authorizing the Liquidators entry into the Settlement Agreement – is discretionary, comity should ordinarily be granted to foreign judgments and court orders unless unique circumstances warrant denial. *See, e.g., CT Investment Management Co. v. Cozumel Caribe, S.A. de C.V. (In re Cozumel Caribe, S.A. de C.V.)*, 482 B.R. 96, 109, 113 (Bankr. S.D.N.Y. 2012)).  While discretionary, "[f]ederal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *In re Atlas Shipping A/S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009).

22

59.     The Liquidators submit that, while the merits of the Settlement Agreement clearly meet (and, indeed, surpass) the standards for approval under applicable United States principles, it is also appropriate to apply principles of international comity to give effect to the Cayman Court's order authorizing the Liquidators to enter into the Settlement Agreement.  In fact, it is appropriate to grant comity to an order of a foreign court so long as that order (i) does not offend strong United States policy, and (ii) the foreign judiciary is respected, as in the case of the Cayman Court.  *See Interamerican Asset Mgmt. Fund Ltd. V. Ortega* (*In re Ortega*), 573 B.R. 284, 291 (Bankr. S.D. Fla. 2017).

60.     Here, the Cayman Approval Order offends no United States policy.   To the contrary, the analysis undertaken by the Cayman Court – as reflected in the Minute of Order – is substantially consistent with the *Justice Oaks* factors.  Specifically, the Cayman Court considered: (i) whether the proposed Settlement was in the commercial best interest of the companies in liquidation, which best interests are *prima facie* reflected by the commercial judgment of the Liquidators; (ii) the Liquidators' position, which position should be given "considerable weight," unless the evidence reveals a substantial reason for not doing so; (iii) the wishes of the creditors; and (iv) whether the interests of stakeholders are best served by permitting the companies in liquidation to enter into the proposed transaction.  These legal principles are reflected in the Minute of Order and are, in substance, identical to the *Justice Oaks* factors analyzed extensively above. In other words, granting comity offends no U.S. public policy, the first factor courts will look at in assessing a request for comity.

61.     The second factor – the respect for the Cayman Court – is also satisfied here.   The Cayman Islands are an Overseas Territory of the United Kingdom with a Governor appointed by the United Kingdom and a highly qualified and respected judiciary appointed by the Governor, on

the advice of an independent Judicial and Legal Services Commission. The decisions of the Cayman Court are appealable ultimately to the Judicial Committee of His Majesty's Privy Council in London which is composed of judges of the United Kingdom Supreme Court. The Judge overseeing the Liquidations – the Hon. Cheryll Richards – is a King's Counsel and a former Director of Public Prosecutions for the Cayman Islands who has been sitting as a judge of the Cayman Court for over five years. More broadly, the Cayman Court has been recognized – and is a highly respected jurisdiction – in courts throughout the United States. *In re Blackwell*, 270 B.R. 814, 823 (Bankr. W.D.Tex. 2001) ("Just as U.S. court [sic] traditionally extend comity to the decisions of Great Britain, the courts traditionally extend the same courtesy to the courts of the Cayman Islands."). The relevant foreign judiciary is therefore a highly respected one and should therefore be afforded comity by this Court.

62.    The relief the Liquidators seek by this Settlement Motion is co-extensive with the relief that the Liquidators sought before the Cayman Court:  the authority to enter into the Settlement Agreement.  The Settlement Agreement is a straightforward and bilateral resolution of disputes between the Liquidators and Deutsche Bank.  It does not impact or impair the rights of any third party.  The Liquidators bring this Settlement Motion because the claims they seek to settle against Deutsche Bank are arguably assets "within the territorial jurisdiction of the United States" insofar as they deal with acts that occurred within the United States, and claims brought in a Florida court under United States legal theories.  *See* 11 U.S.C. § 1520(a)(2).  Therefore, the Liquidators submit that it is appropriate for this Court to play a "supporting role" to the Cayman Court (as contemplated by the court in *JSC*, cited above), and recognize and enforce the order of the Cayman Court approving the settlement under principles of international comity.

24

## CONCLUSION

63.    For the reasons set forth herein, the Liquidators respectfully request that the Court enter the Proposed Order attached hereto as **Exhibit A** (a) approving the Settlement Agreement and (b) granting such other and further relief as the Court deems just and proper.

Respectfully submitted this 23 day of January 2024.

**EFR LAW FIRM**

*/s/ Eduardo F. Rodriguez*
Eduardo F. Rodriguez
(Florida Bar No. 36423)
800 S. Douglas Road, Suite 350
Coral Gables, Florida 33134
(305) 340-0034 (Telephone)

and

**ALSTON & BIRD LLP**

William Sugden
(*Admitted pro hac vice*)
Leah Fiorenza McNeill
(*Admitted pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000 (Telephone)

*Attorneys for the Joint Official Liquidators (in their capacity as Foreign Representatives)*

## EXHIBIT A

**[Proposed Order]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:

North Pointe Holdings (BVI) Ltd. (in
Liquidation), *et al.*,

       Debtors in Foreign Proceedings.[12]

Chapter 15

Case No. 18-24659-SMG

Jointly Administered

**ORDER GRANTING MOTION OF THE JOINT OFFICIAL LIQUIDATORS**
**(IN THEIR CAPACITY AS FOREIGN REPRESENTATIVES) FOR ORDER**
**APPROVING COMPROMISE AND SETTLEMENT WITH DEUTSCHE BANK**

      THIS MATTER came before the Court on the *Motion of the Joint Official*

*Liquidators' (in their capacity as Foreign Representatives) for Order Approving Compromise*

*and Settlement with Deutsche Bank* [D.E. ___] (the "***Settlement Motion***"). Capitalized terms

used but not otherwise defined herein shall have the meaning ascribed to such terms in the

---

[12] The "***Chapter 15 Debtors***" are (i) Diversified Real Estate Development Ltd. (in Official Liquidation); (ii) GMS Global Market Step Up Note Ltd. (in Official Liquidation); (iii) Preferred Income Collateralized Interest Ltd. (in Official Liquidation); (iv) Sentinel Investment Fund SPC (in Official Liquidation); (v) SG Strategic Income Ltd. (in Official Liquidation); (vi) Sports Aficionados Ltd. (in Official Liquidation); (vii) Vanguardia Group Inc. (in Official Liquidation); (viii) Vanguardia Holdings Ltd. (in Liquidation); (ix) Spyglass Investment Management Ltd. (in Liquidation); (x) North Pointe Holdings (BVI) Ltd. (in Liquidation); (xi) Biscayne Capital Holdings Limited (in Creditor Voluntary Liquidation); and (xii) Biscayne Capital (B.V.I.) Ltd. (in Liquidation). In addition to the Chapter 15 Debtors, Sentinel Mandate & Escrow Ltd. ("***SME***") is a party to and a releasor under the Settlement Agreement described in this Motion. SME is not a Chapter 15 Debtor, and the Liquidators are not seeking relief related to SME in this Motion.

Settlement Agreement.  The Settlement Agreement is attached hereto as **Exhibit A**.  The Court having reviewed the Settlement Motion, having been advised of the proposed settlement and the terms set forth in the Settlement Agreement, having determined that the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and authority to enter an order approving the Settlement Agreement pursuant to 11 U.S.C. §§ 105(a) and 1521, 28 U.S.C. § 1651, and Bankruptcy Rule 9019, and having held a hearing on the Settlement Motion on [●] [●], 2024, finds:

A.     Proper, timely, adequate, and sufficient notice of the Settlement Motion and of the relief requested thereby was given to all parties to whom the Liquidators are required to provide notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and such notice was reasonable and appropriate under the circumstances and comports in all regards with the requirements of due process and applicable law.

B.     The Court has jurisdiction over the Settlement Motion and authority to enter this Order pursuant to 28 U.S.C. §§ 157(a) and 1334(b). The Settlement Motion, and entry of this Order, is a core matter pursuant to 28 U.S.C. § 157(b). The Court has statutory authority to enter this Order, pursuant to 11 U.S.C. §§ 105(a) and 1521, 28 U.S.C. §1651, and Bankruptcy Rule 9019.

C.     The Liquidators and Deutsche Bank AG together with its affiliates (the "***Settlement Parties***") have each agreed to be bound by the terms of the Settlement Agreement. No party has objected to the entry of an Order approving the terms of the Settlement Agreement.

**IT IS ORDERED THAT:**

1.     The Settlement Motion is **GRANTED**;

2.      The Settlement Agreement and any settlement or compromise by the Liquidators contained within the Settlement Agreement are hereby **APPROVED** in their entirety pursuant to Bankruptcy Rule 9019, 11 U.S.C. §§ 105(a) and 1521, and 28 U.S.C. § 1651;

3.      The form and means of notice of the Settlement Agreement, the Settlement Motion, and this Order, pursuant to Bankruptcy Rule 2002, are appropriate under the circumstances and a good and sufficient method of giving notice to all persons whose interest could be affected by the Settlement Agreement and this Order;

4.      The Liquidators are authorized to take any and all actions, and to execute any and all documents, necessary to effectuate the terms of the Settlement Agreement;

5.      Notwithstanding the foregoing, nothing in this Order shall relieve the Settlement Parties from their obligations under the Settlement Agreement; and

6.      The Court retains jurisdiction with respect to the interpretation and enforcement of the Settlement Agreement and this Order.

###

Submitted by:

**EFR LAW FIRM**

*/s/  Eduardo F. Rodriguez*
Eduardo F. Rodriguez
(Florida Bar No. 36423)
800 S. Douglas Road, Suite 350
Coral Gables, Florida 33134
(305) 340-0034 (Telephone)

and

**ALSTON & BIRD LLP**

William Sugden
(*Admitted pro hac vice*)
Leah Fiorenza McNeill
(*Admitted pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000 (Telephone)

*Attorneys for the Joint Official Liquidators*
*(in their capacity as Foreign Representatives)*

## EXHIBIT B

**[Settlement Agreement]**

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement Agreement (the "**Agreement**") is entered into as of January 22, 2024 (the "**Effective Date**") by and among (1) on the one hand, Deutsche Bank AG ("**Deutsche Bank**"); and (2) on the other, Michael Pearson, Andrew Childe, and Anna Silver, on behalf of and in their capacities as Joint Official Liquidators (collectively the "**Liquidators**") of Biscayne Capital (B.V.I.) Ltd., Biscayne Capital Holdings Ltd, Diversified Real Estate Development Ltd (formerly known as ORC Senior Secured Ltd.), GMS Global Market Step Up Note Ltd, North Pointe Holdings (BVI) Ltd., Preferred Income Collateralized Interest Ltd, Sentinel Investment Fund SPC, SG Strategic Income Ltd, Sports Aficionados Ltd, Spyglass Investment Management Ltd., Vanguardia Group Inc., and Vanguardia Holdings Ltd. (collectively, the "**Chapter 15 Entities**"), and Sentinel Mandate and Escrow Ltd. (together with the Chapter 15 Entities, the "**Represented Entities**," and together with the Liquidators, the "**Claimants**"). Deutsche Bank and the Claimants are each referred to herein as a "**Party**" and collectively as the "**Parties**."

### RECITALS

**WHEREAS**, the Liquidators are the duly-appointed liquidators and fiduciaries of each of the Represented Entities and the duly appointed foreign representatives (as that term is defined in title 11 of the United States Code) of the Chapter 15 Entities; and

**WHEREAS,** on July 6, 2019, the Liquidators brought a civil action in the United States District Court for the Southern District of Florida (the "**District Court**") captioned *Michael Pearson et al.* v. *Deutsche Bank AG et al.* (Case No. 21-cv-22437-BB) (the "**Action**") on behalf of certain of the Represented Entities, alleging (as stated in an Amended Complaint filed September 24, 2021) fraudulent trading in violation of Cayman Islands Companies Law § 147 (Count One), aiding and abetting breach of fiduciary duty (Count Two), breach of fiduciary duty (Count Three), aiding and abetting conversion (Count Four), breach of contract (Count Five), negligence (Count Six), violation of the Florida Civil Remedies for Criminal Practices Act (Count Seven), and violation of Florida's Civil Remedies for Theft or Exploitation Statute (Count Eight), all in connection with dealings between certain of the Represented Entities and Deutsche Bank AG, Deutsche Bank (Suisse) S.A., Deutsche Bank Luxembourg S.A., and Deutsche Bank Trust Company Americas (the "**Subject Matter**"); and

**WHEREAS**, all counts against Deutsche Bank (Suisse) S.A., Deutsche Bank Luxembourg S.A., and Deutsche Bank Trust Company Americas were dismissed before trial; seven of the eight counts against Deutsche Bank AG – Counts One through Five, Seven, and Eight – were dismissed before trial or resolved at trial in favor of Deutsche Bank AG; and Count Six (alleging negligence), was resolved in favor of the Liquidators against Deutsche Bank AG by a jury verdict on April 25, 2023, which awarded $95,000,000 to the Liquidators; and

**WHEREAS**, on October 6, 2023, the District Court entered an Amended Final Judgment (the "**Amended Final Judgment**"), in favor of the Liquidators on Count Six (alleging negligence), and in favor of Deutsche Bank AG on all other counts, and awarding the Liquidators $95,000,000 in damages, $16,587.59 in pre-judgment interest, and $18,072.35 in taxable costs; and

**WHEREAS**, Deutsche Bank AG filed a timely notice of appeal, and the Liquidators filed

a timely notice of cross-appeal (together, the "**Appeals**") in the United States Court of Appeals for the Eleventh Circuit (the "**Court of Appeals**"), and the Appeals, Case No. 23-13327 and 23-13475, remain pending; and

**WHEREAS**, the Parties wish to settle, compromise and finally resolve all claims and potential claims that the Claimants and Deutsche Bank asserted or could have asserted against one another in the Action and/or arising from or concerning the Action and/or the Subject Matter; and

WHEREAS, prior to the execution of this Agreement, the Liquidators obtained approval of the Grand Court of the Cayman Islands (the "**Cayman Court**") to enter into this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**1.     No Admission of Liability.**  The Parties agree that nothing contained herein, and no action taken by any Party with respect to this Agreement, shall constitute or be construed as an admission of liability or any wrongdoing.

**2.     Settlement Amount.**  In exchange for the Mutual Release (as defined in Paragraph 6 below), Dismissal of Claims (as defined in Paragraph 7 below), and Dismissal of the Appeals (as defined in Paragraph 9 below), Deutsche Bank will pay $43,500,000 (the "**Settlement Amount**") by wire transfer into an escrow account bearing interest at a prevailing market rate (the "**Escrow Account**," the agreement governing which is attached hereto as **Exhibit A** (the "**Escrow Agreement**")). The Settlement Amount shall be paid into the Escrow Account with the account information and wiring instructions set forth in **Exhibit B** hereto within fourteen (14) days after the Effective Date of this Agreement.  For the avoidance of doubt, the full payment of the Settlement Amount ($43,500,000) into the Escrow Account in accordance with this paragraph fully discharges Deutsche Bank's financial obligations under this Agreement, with the exception that, if Deutsche Bank exercises its option set forth in Paragraph 5 below (Deutsche Bank's Right to Remission of Settlement Amount if Required Court Approvals Remain Pending After Twenty-Four Months), Deutsche Bank will have the payment obligations set forth in Paragraph 5.  In particular, all expenses associated with the Escrow Account, including all fees and expenses of the escrow agent, of any required notices, or any other administrative expenses, shall be the sole responsibility of the Claimants.

**3.     Payment and Releases Effective upon Court Approval.**  No later than two (2) business days after the Effective Date, the Liquidators will file a motion in the United States Bankruptcy Court for the Southern District of Florida (the "**U.S. Court**" and together with the Cayman Court, the "**Courts**") seeking approval of the U.S. Court of the Liquidators' entry into and performance under this Agreement.  The Liquidators shall thereafter make all reasonable good faith efforts to secure the full and final approval by the U.S. Court of the settlement agreed to herein as expeditiously as possible.  The approval by the U.S. Court required under this Paragraph 3, including the exhaustion of any appeals, and the exhaustion of any appeals from the approval obtained from the Cayman Court, shall be referred to as the "**Required Court Approvals**."  The terms of this Agreement concerning Release of Payment (Paragraph 4), Mutual Release (Paragraph 6), Dismissal of Claims (Paragraph 7), and Dismissal of the Appeals (Paragraph 9) are conditioned

2

on, and effective only upon, the U.S. Court's full and final approval of all of material terms of the settlement agreed to herein, and the exhaustion of any appeals in both the United States and the Cayman Islands.

**4.** **Release or Return of Payment.**  Within seven (7) days after the Required Court Approvals, the Parties shall jointly instruct the escrow agent for the Escrow Account to release the Settlement Amount, along with all accrued interest, from the Escrow Account to the Liquidators (the "**Release of Payment**"), as provided for in Section 4(a)(i) of the Escrow Agreement.  Within three (3) business days after either (1) the U.S. Court refuses to approve all material terms of, or rejects any material term of, the settlement agreed to herein, or (2) if the settlement is rejected on appeal from either Court, the Parties shall jointly instruct the escrow agent to return the Settlement Amount, along with all accrued interest, to Deutsche Bank (the "**Return of Payment**"), as provided for in Section 4(a)(i) of the Escrow Agreement.  Upon Deutsche Bank's receipt of the Return of Payment, this Agreement shall be null and void, the Parties shall be released from all obligations under the Agreement, and the Appeals will proceed.

**5.** **Deutsche Bank's Right to Remission of Settlement Amount if Required Court Approvals Remain Pending After Twenty-Four Months.**  If the Required Court Approvals, not including the exhaustion of any appeals, have not been obtained as of a date twenty-four (24) months after the Liquidators applied for such approval(s) as provided for in Paragraph 3 above, Deutsche Bank may, by written notice, at its sole discretion and at any time before the Required Court Approvals are obtained, demand the return of the Settlement Amount from the Escrow Account, in which case the Settlement Amount shall be returned, with all accrued interest, to Deutsche Bank within three (3) business days, as provided for in Section 4(a)(ii) of the Escrow Agreement attached hereto as Exhibit A, but the remainder of this Agreement shall remain in effect.  Should Deutsche Bank exercise its option under this paragraph, and should the settlement thereafter receive the full and final Required Court Approvals, Deutsche Bank will pay the Liquidators the Settlement Amount ($43,500,000) plus all interest that would have accrued in the escrow account had Deutsche Bank not exercised its option under this paragraph, and the terms of this Agreement concerning Mutual Release (Paragraph 6), Dismissal of Claims (Paragraph 7), and Dismissal of the Appeals (Paragraph 9) will be effective upon the Liquidators receipt of payment.  Should Deutsche Bank exercise its option under this paragraph, and should the settlement thereafter be rejected by the U.S. Court, or on appeal from either Court, this Agreement shall be null and void, the Parties shall be released from all obligations under the Agreement, and the Appeals will proceed.

**6.** **Mutual Release.**  Upon the Release of Payment to the Liquidators (as defined in Paragraph 4 above), or payment of the Settlement Amount to the Liquidators following Deutsche Bank's exercise of its option under Paragraph 5 above:

    **a.** The Claimants, collectively and individually, along with each of their heirs, executors, administrators, agents, servants, representatives, employees, partners, limited partners, trustees, members, attorneys, successors, assigns, affiliates, parents, subsidiaries, ultimate beneficial owners, and beneficiaries, in their capacities as such, hereby forever release and discharge Deutsche Bank and each of its past, present, and future businesses, affiliates, parents, subsidiaries, joint venturers, assigns, trustees, owners, principals, officers, directors, shareholders, agents, employees, independent contractors, attorneys, insurers, and representatives, in their capacities as such, of and from the Amended Final

Judgment and any other judgments, orders, and rulings in the Action, together with any and all liability, claims (legal or administrative), defenses, causes of action, obligations, duties, penalties, attorneys' fees, costs, damages, injuries, or liabilities of any nature whatsoever, whether based on contract, tort, statute, or other legal or equitable theory of recovery, whether now known or unknown, whether past, present, or future, which any of the Claimants now has, claims to have had, or otherwise may have, arising out of, or concerning, whether directly or indirectly, the Subject Matter or the Action (the "**Claimants' Release**").

b.  Deutsche Bank and its heirs, executors, administrators, agents, servants, representatives, employees, partners, limited partners, trustees, members, attorneys, successors, assigns, affiliates, parents, and subsidiaries, in their capacities as such, hereby forever release and discharge Claimants and each of their past, present, and future businesses, affiliates, parents, subsidiaries, joint venturers, assigns, trustees, owners, principals, officers, directors, shareholders, agents, employees, independent contractors, attorneys, insurers, ultimate beneficial owners, beneficiaries, and representatives, in their capacities as such, of and from any and all liability, claims (legal or administrative), defenses, causes of action, obligations, duties, penalties, attorneys' fees, costs, damages, injuries, or liabilities of any nature whatsoever, whether based on contract, tort, statute, or other legal or equitable theory of recovery, whether now known or unknown, whether past, present, or future, which Deutsche Bank now has, claims to have had, or otherwise may have, arising out of, or concerning, whether directly or indirectly, the Subject Matter or the Action (the "**Deutsche Bank Release**" and together with the Claimants' Release, the "**Mutual Release**").

c.  With respect to the Claimants' Release and the Deutsche Bank Release, respectively, Claimants and Deutsche Bank each expressly waive and relinquish all rights and benefits under any law or legal principle, of any jurisdiction, which provides that general releases do not extend to claims unknown to the Parties at the time of the release, and Claimants and Deutsche Bank each affirm that they have been fully advised of the significance thereof.  Neither Claimants nor Deutsche Bank are releasing each other from their obligations under this Agreement.

**7.     Dismissal of Claims.**  No later than two (2) business days after the Release of Payment to the Liquidators  (as defined in Paragraph 4 above), or payment of the Settlement Amount to the Liquidators following Deutsche Bank's exercise of its option under Paragraph 5 above, the Parties will enter into and file with the District Court a stipulation voluntarily dismissing the Action, including all claims and counterclaims in the Action (the "**Dismissal of Claims**").  The Parties will each take all good faith and reasonable steps as are necessary to secure the dismissal of the Action, including all claims and counterclaims in the Action, as expeditiously as possible.

**8.     Suspension of Briefing Schedule in Appeals.**  The Parties agree that they will each take all good faith and reasonable steps necessary to secure from the Court of Appeals such adjournments of the briefing schedule in the Appeals to the extent needed to obtain the Required Court Approvals.  Should the Court of Appeals at any time deny an adjournment or make any other decision that would require the filing of briefs before the Required Court Approvals are obtained (or, if the Required Court Approvals have been obtained, before the Release of Payment under Paragraph 4, Dismissal of Claims under Paragraph 7, and Dismissal of the Appeals under

4

Paragraph 9), then at either Party's request the Parties within two (2) business days shall file a joint motion for a stay of the Appeals pending the satisfaction of these conditions. Should the U.S. Court deny the Liquidators' application for approval of the settlement under Paragraph 3 above, or should the settlement be rejected on appeal from the U.S. Court or the Cayman Court, the Parties will inform the Court of Appeals and take such steps as are necessary to permit the Appeals to proceed.

**9.     Dismissal of the Appeals.**  Should the Required Court Approvals be obtained, then within two (2) business days after the Release of Payment to the Liquidators (as defined in Paragraph 4 above), or payment of the Settlement Amount to the Liquidators following Deutsche Bank's exercise of its option under Paragraph 5 above, the Parties will file a stipulation with the Court of Appeals dismissing the Appeals.  The Parties will take all good faith and reasonable steps as are necessary to secure the dismissal of the Appeals.

**10.     Agreement to Stay Execution of Amended Final Judgment Pending Full Effectiveness of Agreement.**  Claimants agree that they will not seek to enforce the Amended Final Judgment while the Required Court Approvals are pending.

**11.     Authority.**  Each Party and signatory to this Agreement represents and warrants to the other Party hereto that such Party and signatory has full power, authority, and legal right, and has obtained all approvals and consents necessary to execute, deliver, and perform all actions required under this Agreement. Each Party further agrees, for itself and for its successors and/or assigns, that it will do all such further acts, and prepare, execute, and deliver all such documents as may reasonably be required or requested to carry out the stated objectives of this Agreement.  *In particular*, the Liquidators, individually and collectively, represent and warrant that they, individually and collectively, have full power, authority and legal right, and have obtained all approvals and consents, necessary to execute this Agreement on behalf of the Represented Entities, and to bind the Represented Entities to the terms of this Agreement, including but not limited to the Claimants' Release.

**12.     Effective Date.**  This Agreement shall be effective on the date all Parties whose signatures are required below have signed the Agreement.

**13.     Confidentiality.**  The Parties covenant and agree to keep this Agreement and the terms of this Agreement, and any communications relating to this Agreement (the "**Confidential Information**") confidential, and each Party warrants that it shall not disclose the Confidential Information in any form or fashion, unless the disclosing party determines in its good faith judgment that such disclosure is appropriate in order to comply with any law, regulation, subpoena, court order, legal obligation, or regulatory request, requirement, expectation, or obligation, to obtain the Required Court Approvals, or for the Liquidators to communicate with creditors in connection with the Required Court Approvals or as required by the laws of the Cayman Islands or the United States Bankruptcy Code, *provided that* the disclosing Party shall disclose only that portion of the Confidential Information that it determines in its good faith judgment is necessary to be furnished, and seek confidential treatment of the Agreement to the extent permitted by applicable law. With the exception of disclosure for the purpose of obtaining Required Court Approvals, or to creditors in connection therewith, prior to disclosing any Confidential Information in a legal proceeding or pursuant to a subpoena, the disclosing party shall provide at least two weeks' notice, or if a court or regulatory obligation requires disclosure in less than two weeks, as much notice as is reasonably practicable, to the other Parties hereto of the disclosure request; and,

5

with respect to any subpoena, request for production, or other request for discovery or disclosure made in litigation, shall provide the other Parties hereto the opportunity to resist disclosure, unless such notice and opportunity is contrary to law, rule, or regulatory request or expectation. Each Party shall be responsible for any use of the Confidential Information by its employees, contractors, consultants, and advisors. Notwithstanding anything to the contrary in this Agreement, either Party may disclose the Agreement and its terms to the extent necessary to enforce the Agreement, or on a reasonable, need-to-know basis to any tax advisor, financial advisor, accountant, auditor, attorney for the purpose of providing legal advice, and/or similar advisor.

**14.    Execution and Counterparts.** The Parties may execute this Agreement in counterparts. The signature pages may then be reassembled to form a single document. Faxed or emailed signatures on this Agreement shall be considered original signatures.

**15.    Entire Agreement; Modification.** This Agreement constitutes the entire agreement among the Parties and overrides and replaces all prior negotiations and terms proposed or discussed, whether in writing or orally, about the subject matter hereof. No modification of this Agreement will be valid unless it is in writing identified as an Amendment to this Agreement and is signed by all Parties.

**16.    Applicable Law and Forum Selection.** This Agreement shall be governed by the laws of the State of New York, and the Parties agree that the federal and state courts of New York shall have exclusive jurisdiction over any suit, action, or proceeding arising out of or in connection with this Agreement.

**THE PARTIES HAVE READ, UNDERSTOOD, AND AGREED TO THE TERMS AND CONDITIONS OF THIS AGREEMENT.**

**DEUTSCHE BANK AG**

By: _____

Name: _____

Title: _____


By: _____

Name: _CHRISTINE HENTKE_

Title: _____

**LIQUIDATORS
MICHAEL PEARSON, AS
LIQUIDATOR, AUTHORIZED
REPRESENTATIVE, AND FOREIGN
REPRESENTATIVE, OF THE
REPRESENTED ENTITIES**

By: _____

Name: _____

Title: _____

6

**DEUTSCHE BANK AG**

By: _____

Name: _____

Title: _____

**LIQUIDATORS**

**MICHAEL PEARSON, AS
LIQUIDATOR, AUTHORIZED
REPRESENTATIVE, AND FOREIGN
REPRESENTATIVE, OF THE
REPRESENTED ENTITIES**

By: _____

Name: Michael Pearson

Title: Liquidator and Authorized Representative

**ANDREW CHILDE, AS LIQUIDATOR,
AUTHORIZED REPRESENTATIVE,
AND FOREIGN REPRESENTATIVE, OF
CERTAIN OF THE REPRESENTED
ENTITIES**

By: _____

Name: Andrew Childe

Title:  Liquidator and Authorized
Representative

**ANNA SILVER, AS LIQUIDATOR,
AUTHORIZED REPRESENTATIVE,
AND FOREIGN REPRESENTATIVE, OF
CERTAIN OF THE REPRESENTED
ENTITIES**

By: _____

Name: Anna Silver

Title:  Liquidator and Authorized
Representative

**REPRESENTED ENTITIES**

**BISCAYNE CAPITAL (B.V.I.) LTD.**

By: _____

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

**BISCAYNE CAPITAL HOLDINGS LTD**

By: _____

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

**DIVERSIFIED REAL ESTATE
DEVELOPMENT LTD (FORMERLY
KNOWN AS ORC SENIOR SECURED
LTD.)**

By: _____

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

**GMS GLOBAL MARKET STEP UP
NOTE LTD**

By: _____

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

**NORTH POINTE HOLDINGS (BVI) LTD.**

By: _____

Name: Anna Silver

Title:  Liquidator and Authorized Representative

**PREFERRED INCOME COLLATERALIZED INTEREST LTD**

By: _____

Name: Anna Silver

Title:  Liquidator and Authorized Representative

**SENTINEL INVESTMENT FUND SPC**

By: _____

Name: Anna Silver

Title:  Liquidator and Authorized Representative

**SENTINEL MANDATE AND ESCROW LTD.**

By: _____

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

**SG STRATEGIC INCOME LTD**

By:

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

**SPORTS AFICIONADOS LTD**

By:

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

**SPYGLASS INVESTMENT
MANAGEMENT LTD.**

By:

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

**VANGUARDIA GROUP INC.**

By:

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

**VANGUARDIA HOLDINGS LTD.**

By:

Name: Anna Silver

Title:   Liquidator and Authorized
Representative

# EXHIBIT A

Release and Settlement Agreement

Execution Version

ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of January [●], 2024, by and among  Michael Pearson, Andrew Childe, and Anna Silver, on behalf of and in their capacities as Joint Official Liquidators (collectively the "Liquidators") of Biscayne Capital (B.V.I.) Ltd., Biscayne Capital Holdings Ltd, Diversified Real Estate Development Ltd (formerly known as ORC Senior Secured Ltd.), GMS Global Market Step Up Note Ltd, North Pointe Holdings (BVI) Ltd., Preferred Income Collateralized Interest Ltd, Sentinel Investment Fund SPC, SG Strategic Income Ltd, Sports Aficionados Ltd, Spyglass Investment Management Ltd., Vanguardia Group Inc., and Vanguardia Holdings Ltd. (collectively, the "Chapter 15 Entities"), and Sentinel Mandate and Escrow Ltd. (together with the Chapter 15 Entities, the "Represented Entities," and together with the Liquidators, the "Claimants"), Deutsche Bank AG, "Deutsche Bank"), and Citibank, N.A., as escrow agent (the "Escrow Agent" and together with the Liquidators and Deutsche Bank, the "Parties"). Capitalized terms not defined herein shall have the meanings assigned to them in the Settlement Agreement (defined below).

RECITALS

WHEREAS, Deutsche Bank, on the one hand, and Liquidators on behalf of the Represented Entities, on the other hand, are parties to that certain Release and Settlement Agreement, dated January [●], 2024 (as amended, supplemented or restated from time to time, the "Settlement Agreement"), pursuant to which a civil action pending in the United States District Court for the Southern District of Florida captioned *Michael Pearson et al.* v. *Deutsche Bank AG et al.* (Case No. 21-cv-22437-BB) (the "Action") will be resolved, upon the approval of the United States Bankruptcy Court for the Southern District of Florida (the "U.S. Court").

The Settlement Agreement provides for, *inter alia*, (a) the deposit of the Settlement Sum in the amount of forty-three million five hundred thousand U.S. Dollars ($43,500,000) (the "Escrow Amount") into an interest-bearing escrow account  within 14 days after the Effective Date of the Settlement Agreement, and (b) the distribution of the Escrowed Funds (as defined below) to the Liquidators or Deutsche Bank in accordance with the terms hereof and as described in the Settlement Agreement.

Prior to the date hereof, the Liquidators provided Deutsche Bank with the appropriate forms W-9 or W-8 as applicable and such other forms and documents that Deutsche Bank may request.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties hereto agree as follows:

1.    Appointment. The Liquidators and Deutsche Bank hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.      Escrow Funds.

(a)      As provided by the Settlement Agreement, and subject to the terms and conditions thereof, within fourteen days of the Effective Date of the Settlement Agreement, in accordance with the Settlement Agreement, Deutsche Bank is required to cause to be deposited with the Escrow Agent the Escrow Amount in immediately available funds. The Escrow Agent hereby acknowledges receipt of the Escrow Amount in a separate and distinct account (the "Escrow Account"), subject to the terms and conditions of this Agreement.

(b)      All interest, dividends, gains and other income earned with respect to the Escrow Amount (collectively, the "Escrow Earnings" and together with the Escrow Amount the "Escrow Funds") shall be retained by the Escrow Agent and reinvested in the Escrow Account and shall become part of the Escrow Funds; and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement.

3.      Investment of Escrow Funds.

(a)      Unless otherwise instructed in writing by an Authorized Representative of the Liquidators and Deutsche Bank, the Escrow Agent shall hold the Escrow Funds in an interest-bearing deposit account insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits. The Parties acknowledge that the initial interest rate is subject to change from time to time and shall be reflected in the monthly statement provided to the Parties. The Escrow Account shall be a separate account at the Escrow Agent, bearing interest.  The Liquidators and Deutsche Bank acknowledge that the initial interest rate is subject to change from time to time and shall be reflected in the monthly statement provided to the representatives of the Liquidators and Deutsche Bank listed in Section 11 below. The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(b)      The Escrow Agent shall send an account statement to the representatives of the Liquidators and Deutsche Bank listed in Section 11 below on a monthly basis reflecting activity in the Escrow Account for the preceding month.

4.      Disposition and Termination of the Escrow Funds.

(a)      Escrow Funds. The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as provided in, this Section 4(a) as follows:

(i)      Upon receipt of a Disbursement Instruction with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Disbursement Instruction, disburse the Escrow Funds in accordance with such Disbursement Instruction.

(ii)      Pursuant to Paragraph 5 of the Settlement Agreement, Deutsche Bank has a right to remission of the Escrow Funds under certain specified circumstances.  Upon receipt by the Escrow Agent of a copy of a Notice of Remission from Deutsche Bank, the Escrow Agent shall on the third (3rd) Business Day following receipt of such notice, disburse as directed,

2

the Escrow Funds in accordance with such Notice of Remission. The Escrow Agent will act on such Notice of Remission without further inquiry.

(iii)    All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds or check as set forth in the Disbursement Instruction or Notice of Remission, as applicable.

(iv)    Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing and executed by the Liquidators as evidenced by the signatures of the person or persons set forth on <u>Exhibit A-1</u> and/or Deutsche Bank as evidenced by the signatures of the person or persons set forth on <u>Exhibit A-2</u> and delivered to the Escrow Agent either (y) by confirmed facsimile only at the fax number set forth in <u>Section 11</u> below or (z) attached to an e-mail received on a Business Day from an e-mail address set forth in <u>Section 11</u> below. In the event a Disbursement Instruction or Notice of Remission is delivered to the Escrow Agent, whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in <u>Exhibit A-1</u> and/or <u>A-2</u>, as applicable, annexed hereto (the "<u>Call Back Authorized Individuals</u>"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To ensure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing, executed by an authorized signer of the Liquidators or Deutsche Bank set forth on <u>Exhibit A-1</u> or <u>A-2</u>, actually received and acknowledged by the Escrow Agent.

(b)    <u>Certain Definitions</u>.

(i)    "<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii)    "<u>Disbursement Instruction</u>" means any written instruction executed by an authorized signer of the Liquidators and Deutsche Bank directing the Escrow Agent to disburse all or a portion of the Escrow Funds.

(iii)    "<u>Notice of Remission</u>" means a written instruction executed by an Authorized Representative of Deutsche Bank directing the Escrow Agent to disburse the Escrow Funds to Deutsche Bank because Deutsche Bank has elected to exercise its right of remission set forth in paragraph 5 of the Settlement Agreement.

(iv)    "<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.    <u>Escrow Agent</u>. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no duties,

3

including but not limited to any fiduciary duties, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Liquidators and Deutsche Bank, in connection herewith, if any, including without limitation the Settlement Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Liquidators and Deutsche Bank, the terms and conditions of this Agreement will control the actions of Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Disbursement Instruction or Notice of Remission furnished to it hereunder and believed by it to be genuine and to have been signed and presented by an authorized signer of the Liquidators and/or Deutsche Bank. Concurrent with the execution of this Agreement, the Liquidators and Deutsche Bank shall deliver to the Escrow Agent authorized signers' forms in the form of <u>Exhibit A-1</u> and <u>A-2</u> attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from the Liquidators and/or Deutsche Bank which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Disbursement Instruction or Notice of Remission. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or non-action based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's gross negligence or willful misconduct was the cause of any direct loss to the Liquidators and/or Deutsche Bank. To the extent practicable, the Liquidators and/or Deutsche Bank agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

6.      <u>Resignation and Removal of Escrow Agent</u>. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Liquidators and Deutsche Bank specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by the Liquidators and Deutsche Bank acting jointly at any time by providing written notice to the Escrow Agent. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow

Agent under this Agreement without further act.  The Escrow Agent's sole responsibility after such thirty (30) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Liquidators and Deutsche Bank, (ii) as set forth in a Disbursement Instruction, or (iii) in accordance with the directions of a Notice of Remission, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Liquidators and Deutsche Bank have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Liquidators, Deutsche Bank, and the Escrow Agent.

7.    Fees and Expenses.  All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto and shall be paid by the Liquidators. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement.

8.    Indemnity. Each of the Liquidators shall jointly and severally indemnify, defend, and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Escrow Agent Losses") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from the Liquidators and/or Deutsche Bank.  The Liquidators acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9.    Tax Matters.

(a)    North Point Holdings, Ltd on behalf of the Liquidators shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Funds for the calendar year in which such interest or income is earned.  The Escrow Agent shall report any interest or income earned on the Escrow Funds to the IRS or other taxing authority on IRS Form 1099. Prior to the date hereof, the Liquidators shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may request.

(b)    The Escrow Agent shall be responsible only for income reporting to the Internal Revenue Service with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to

5

required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

        (c)    The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

      10.    <u>Covenant of Escrow Agent</u>. The Escrow Agent hereby agrees and covenants with the Liquidators and Deutsche Bank that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

      11.    <u>Notices</u>.  All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (a) by facsimile transmission with written confirmation of receipt, (b) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the Liquidators, Deutsche Bank, and/or the Escrow Agent to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (c) by overnight delivery with a reputable national overnight delivery service, or (d) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited with the United States Postal Service. If notice is given to the Liquidators, Deutsche Bank, and/or the Escrow Agent, it shall be given at the address set forth below. It shall be the responsibility of the Liquidators and Deutsche Bank to notify the Escrow Agent and each other in writing of any name or address changes.

        <u>If to the Liquidators, then to</u>:

          Fund Fiduciary Partners
          Attn: Andrew Childe
          10 Market Street #769
          Camana Bay
          Grand Cayman, KY1-9006
          Cayman Islands
          Telephone No.: (345) 947-5854
          E-mail: andrew.childe@ffp.ky

        <u>with a copy (which shall not constitute notice) to</u>:

Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Attn: William S. Sugden
Telephone No.: (404) 881-7000
E-mail: will.sugden@alston.com

or, if to the Escrow Agent, then to:

Citibank, N.A.
Citi Private Bank
388 Greenwich Street, 29th Floor
New York, New York 10013
Attn: Eddy Rosero and Nelson Kercado
Telephone No.: (212) 783-7073 and (212) 559-8509
Facsimile No.: (212) 783-7131
E-mail: eddy.rosero@citi.com and nelson.kercado@citi.com

or, if to Deutsche Bank, then to:

David G. Januszewski
Anirudh Bansal
Cahill Gordon & Reindel LLP
32 Old Slip
New York, New York 10005
Telephone No. (212) 701-3352
Telephone No. (212) 701-3207
djanuszewski@cahill.com
abansal@cahill.com

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (a) through (d) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.    Termination. This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by the Liquidators and Deutsche Bank after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13.    Miscellaneous. The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto and Deutsche Bank. Neither this Agreement nor any right or interest hereunder may be assigned in

7

whole or in part by any party without the prior consent of the other parties and Deutsche Bank. This Agreement shall be governed by and construed under the laws of the State of New York. Each Party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of New York solely for purposes of resolving any dispute as to the interpretation or enforcement of this Agreement. The Parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by facsimile or electronic transmission in portable document format (.pdf), and such facsimile or .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. The Liquidators and Deutsche Bank represent, warrant and covenant that each document, notice, instruction or request provided by the Liquidators and Deutsche Bank to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.  Except as expressly provided in <u>Section 8</u> nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent, the Liquidators, and Deutsche Bank any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14. <u>Compliance with Court Orders</u>. In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15. <u>Further Assurances</u>. Following the date hereof, each Party shall deliver to the other Parties such further information and documents and shall execute and deliver to the other Parties such further instruments and agreements as any other Party or Parties shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other Party the benefits hereof.

16. <u>Assignment</u>. No assignment of the interest of under this Agreement shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and

consented to by the Escrow Agent (such consent not to be unreasonably withheld). Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.    Force Majeure. The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.    Compliance with Federal Law. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all entities depositing funds at Citibank pursuant to the terms and conditions of this Agreement. For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see financial statements, licenses, and identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.    Use of Citibank Name. No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

20.    Use of Electronic Records and Signatures. As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute," "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits and Schedules, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by Escrow Agent in Escrow Agent's sole discretion, and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-ink signature; provided, however, that any such electronic signature must be an actual and not a typed signature. In accordance with Section 8 of this Agreement, Escrow Agent shall be indemnified and held harmless from any Escrow Agent Losses it incurs as a result of its acceptance of and reliance on electronic signatures that it deems to be genuine. Any electronically signed agreement, instruction or other document shall be an "electronic record" established in the ordinary course of business and any copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meaning ascribed to them in 15 USC § 7006. This Agreement and any instruction or other document furnished hereunder may be transmitted by facsimile or as a PDF file attached to an email.

9

21.    <u>Return of Funds</u>. If the Escrow Agent releases any funds, including but not limited to the Escrow Amount or any portion of it, to the Liquidators or Deutsche Bank and subsequently determines, in its sole discretion, that the payment or any portion of it was made in error, the Liquidators or Deutsche Bank, as appropriate, shall, upon notice, promptly refund the erroneous payment. Any such erroneous payment by the Escrow Agent, and the return thereof to the Escrow Agent, shall not affect any obligation or right of either the Escrow Agent or the Parties.  The Liquidators and Deutsche Bank agree not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to the Escrow Agent's recovery of any erroneous payment.

*    *    *    *    *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

**ANDREW CHILDE,** in his capacity as joint official liquidator of the Note Issuers, and on behalf of Michael Pearson and Anna Silver, in their capacity as joint official liquidators of the Note Issuers

By: _____

Name: _____

Its: _____

**DEUTSCHE BANK, AG**

By: _____

Name: _____

Its: _____

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____

Name: _____

Its: _____

*Signature Page to Escrow Agreement*

## Schedule 1

### ESCROW AGENT FEE SCHEDULE
### Citibank, N.A., Escrow Agent

**Acceptance Fee**

To cover the acceptance of the Escrow Agency appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

> **Fee: WAIVED**

**Administration Fee**

The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on Escrow Amount being deposited in a interest bearing deposit account, FDIC insured to the applicable limits.

> **Fee: WAIVED**

**Tax Preparation Fee**

To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

> **Fee: WAIVED**

**Transaction Fees**

To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

> **Fee:  WAIVED**

**Other Fees**

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform. Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder. The Acceptance Fee, if any, is payable upon execution of the Agreement.  Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

### EXHIBIT A-1

### Certificate as to Liquidators Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Liquidators and are authorized to initiate and approve transactions of all types for the Escrow Account or accounts established under this Agreement, on behalf of Liquidators. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

Name / Title / Telephone                    Specimen Signature


_____                    _____
Name                                        Signature

_____
Title

_____                    _____
Phone                                       Mobile Phone


_____                    _____
Name                                        Signature

_____
Title

_____                    _____
Phone                                       Mobile Phone


_____                    _____
Name                                        Signature

_____
Title

_____                    _____
Telephone                                   Mobile Phone


*Exhibit to Escrow Agreement*

<u>EXHIBIT A-2</u>

<u>Certificate as to Deutsche Bank's Authorized Signatures</u>

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Deutsche Bank and are authorized to initiate and approve transactions of all types for the Escrow Account or accounts established under this Agreement, on behalf of Deutsche Bank.  The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

<u>Name / Title / Telephone</u>                      <u>Specimen Signature</u>

_____          _____
Name                                                    Signature

_____
Title

_____          _____
Phone                                                   Mobile Phone

_____          _____
Name                                                    Signature

_____
Title

_____          _____
Phone                                                   Mobile Phone

_____          _____
Name                                                    Signature

_____
Title

_____          _____
Telephone                                             Mobile Phone

*Exhibit to Escrow Agreement*

# EXHIBIT B

Private Bank                                                                

## *Citi Private Bank*
## *Wire Transfer Instructions*

Prepared For:

**ANDREW CHILDE, in his capacity as joint official liquidator of the Note Issuers, and on behalf of Michael Pearson and Anna Silver, in their capacity as joint official liquidators of the Note Issuers., Deutsche Bank AG., and Citibank, N.A., as Escrow Agent**

**Escrow Account**

| | |
|---|---|
| Bank Name: | Citibank, N.A. – New York, NY |
| ABA Number: | ██████████ |
| SWIFT Code: | ██████ |
| Credit Account: | █████ |
| Credit Account Name: | PBG Concentration Account |
| | |
| Additional Details | |
| Further Credit Account Number: | ████████ |
| Further Credit Account Name: | ANDREW CHILDE - Escrow Account |
| Attention: | Michelle Villa +1 212-559-5097 |
| | Wanda Yvette Simo +1 212-559-9896 |

**IMPORTANT NOTE:**

Please note that escrow funds will be credited to referenced account upon completion of Citi's KYC process for all appropriate parties. In the event that one or more parties fail to be approved, escrow funds will be promptly returned to the sending party.

All incoming wire transfers should be wired **exactly** as stated above.

Wire transfers are received into the above referenced PBG Concentration Account for further credit to client accounts.

Prepared On :Wednesday, January 17, 2024

## EXHIBIT C

**[Cayman Approval Order]**

Digitally signed by Advance Performance Exponents Inc
Date: 2023.12.15 17:07:34 -05:00
Reason: Apex Certified
Location: Apex



**COURT OF THE CAYMAN ISLANDS**
FINANCIAL SERVICES DIVISION

CAUSE NOs. FSD 185, 186, 187, 188, 189, 190, 191 OF 2018 (CRJ)

IN THE MATTER OF COMPANIES ACT (2023 REVISION)

AND IN THE MATTERS OF VANGUARDIA GROUP INC. (IN OFFICIAL LIQUIDATION), SPORTS AFICIONADOS LTD. (IN OFFICIAL LIQUIDATION), SG STRATEGIC INCOME LTD. (IN OFFICIAL LIQUIDATION), GMS GLOBAL MARKET STEP UP NOTE LTD. (IN OFFICIAL LIQUIDATION), PREFERRED INCOME COLLATERALIZED INTEREST LTD. (IN OFFICIAL LIQUIDATION), DIVERSIFIED REAL ESTATE DEVELOPMENT LTD. (IN OFFICIAL LIQUIDATION), SENTINEL INVESTMENT FUND SPC (IN OFFICIAL LIQUIDATION)

---

**ORDER**

---

**UPON the Joint Official Liquidators' ("JOLs") Summons dated 13 December 2023 (the "Summons")**

**AND UPON** reading the Seventh Affidavit of Michael Pearson and Exhibit MP-7

**AND UPON** reading the Skeleton Argument filed on behalf of the JOLs dated 13 December 2023

**AND UPON** the Court determining that the Summons was suitable for determination on the papers without the need for an oral hearing

**IT IS HEREBY ORDERED** that:

1.    The JOLs are granted sanction to enter into and execute a settlement agreement with Deutsche Bank AG and affiliated parties on the terms agreed between them and as more particularly described in the Seventh Affidavit of Michael Pearson.

THIS ORDER is filed by Campbells LLP, Attorneys-at-Law for the Joint Official Liquidators, whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, Cayman Islands (Ref: PDK/33648)

2.  Pursuant to CWR Order 24, rule 6, the Summons, the Seventh Affidavit of Michael Pearson, Exhibit MP-7 and any other evidence filed, and all skeleton arguments, audio recordings (if any) and the Judge's note be sealed on the Court file and kept confidential until further order of the Court.

3.  The JOLs' costs of the Summons be paid from the liquidation estate of the Companies as an expense of the liquidations.

Dated: 15ᵗʰ December 2023

Filed: 15ᵗʰ December 2023

**THE HONOURABLE JUSTICE RICHARDS**
**JUDGE OF THE GRAND COURT**

2

**THIS ORDER** is filed by Campbells LLP, Attorneys-at-Law for the Joint Official Liquidators, whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, Cayman Islands (Ref: PDK/33648)

# **EXHIBIT D**

**[Minute of Order]**

# MINUTE OF ORDER

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**Cause Nos:  FSD 185, 186, 187, 188, 189, 190, 191 of 2018**

**IN THE MATTER OF THE COMPANIES ACT (2023 REVISION)**

**IN THE MATTERS OF VANGUARDIA GROUP INC. (IN OFFICIAL LIQUIDATION), SPORTS AFICIONADOS LTD. (IN OFFICIAL LIQUIDATION), SG STRATEGIES INCOME LTD. (IN OFFICIAL LIQUIDATION), GMS GLOBAL MARKET STEP UP NOTE LTD. (IN OFFICIAL LIQUIDATION), PREFERRED INCOME COLLATERALIZED INTEREST LTD. (IN OFFICIAL LIQUIDATION), DIVERSIFIED REAL ESTATE DEVELOPMENT LTD. (IN OFFICIAL LIQUIDATION), SENTINEL INVESTMENT FUND SPC (IN OFFICIAL LIQUIDATION) (together "the Companies")**

**HEARD ON THE PAPERS**

Coram:  Richards J. KC

APPEARANCES:  N/A

**ORDER:**

Date: 15th December 2023

**UPON** the applications by way of Summons dated 13th December 2023 coming on for hearing.

**AND UPON** being satisfied that it is appropriate as requested by Counsel's letter on behalf of the Companies dated 13th December 2023, that the matter be dealt with on the papers pursuant to Section B.1.1 of the FSD User Guide.

**AND UPON** reading the evidence contained in the Seventh Affidavit of Michael Pearson dated 13th December 2023 together with the attached Exhibit MP-7.

**AND UPON** reading the skeleton argument of Counsel filed 14th December 2023 and the Bundle of Authorities provided.

**AND UPON** considering and applying the principles discussed in the cases of ***Re Edennote Ltd (No 2)*** [1997] 2 BCLC 635, ***Re Greenhaven Motors Ltd (in liquidation)*** [1999] 1 BCLC 35, both of which were cited with approval in this jurisdiction in the cases of ***DD Growth Premium 2X Fund*** [2013] 2 CILR 361 and ***Trident Microsystems (Far East) Limited*** [2012] 1 CILR 424 and noting and considering:

i.      The referenced Seventh Affidavit at paragraph 16 in particular, details and summarises the reasons that it is considered that the proposed settlement is in the best interest of the creditors of the Companies, balancing such factors as the potential risks of an alternative approach.

ii.     Pages 6 to 15 of Exhibit MP 7.

iii.    The views of the Ad Hoc Liquidation Committee as set out in the Resolution dated 11th December 2023.

iv.     The interests of stakeholders.

v.      There appears no substantial reason on the evidence that substantial weight should not be given to the views of the Liquidator.

**AND UPON** concluding that the Court will give considerable weight to the views of the Liquidator in the instant case.

**AND UPON** considering the second aspect of the application which is for a sealing order, and reviewing the principles discussed in the case of ***In the Matter of the Sphinx Group of Companies (in Official Liquidation)*** [2017] 1 CILR 176, noting the nature of the circumstances in the instant application and being satisfied that the information therein is confidential and that such an order is necessary to protect the economic interests of the general body of stakeholders of the Companies.

**IT IS ORDERED THAT:**

1.      Order made in terms of the draft provided:

   a.   Granting sanction to enter into and execute a settlement agreement with Deutsche Bank AG and affiliated parties.
   b.   Sealing all material in relation to this Summons pursuant to CWR Order 24 r.6.
   c.   Granting the Liquidator' costs in relation to the Summons be paid from the liquidation estate.

**Richards J. KC**
**Judge of the Grand Court**